| CATALINA VASQUEZ, | **MEMORANDUM DECISION AND ORDER** |
|---|---|
| Plaintiff, | |
| v. | |
| TRINITY MISSION HEALTH AND REHAB OF PROVO, LLC, dba TRINITY MISSION HEALTH AND REHAB OR PROVO, LP, | Case No. 2:11-CV-01002-EJF |
| Defendant. | Magistrate Judge Evelyn J. Furse |

## I. INTRODUCTION

Defendant Trinity Mission Health and Rehab of Provo, LLC, dba Trinity Mission Health and Rehab of Provo, LP ("Trinity Mission") moved the Court for summary judgment.[1] Plaintiff Catalina Vasquez brought claims against Trinity Mission for unlawful discrimination on the basis of sex, in violation of Title VII and the Utah Anti-discrimination Act, wrongful discharge, defamation, false light invasion of privacy, tortious interference with prospective business relationships, and intentional infliction of emotional distress. The Court carefully reviewed the submissions of the parties and determined it does not need oral argument on this motion. DUCiv R. 7-1(f).

Trinity Mission seeks summary judgment because, it contends, no genuine dispute as to any material fact exists. Trinity Mission claims Ms. Vasquez's cause of action for disparate treatment discrimination fails as a matter of law because she cannot make a prima facie case.

---

[1] The parties consented to jurisdiction by the undersigned Magistrate Judge. (ECF No. 11.)

Furthermore, Trinity Mission claims Ms. Vasquez's cause of action for hostile environment discrimination fails as a matter of law because she failed to put forth evidence on any element of this claim aside from her membership in a protected class. Trinity Mission also argues that because Ms. Vasquez failed to plead vicarious liability, her Complaint's failure to allege Trinity Mission took any of the complained-of actions extinguishes her common law claims. Ms. Vasquez responds that she has set forth sufficient evidence to withstand the Motion for Summary Judgment, and disputed issues of material fact exist, necessitating a trial on all causes of action.

The Court GRANTS the Motion in part and DENIES the Motion in Part.

Analyzing Ms. Vasquez's claims for wrongful discharge, sex discrimination through disparate treatment under the Utah Anti-Discrimination Act, and sex discrimination under Title VII of the Civil Rights Act together, the Court finds Ms. Vasquez submitted enough evidence to create a question of fact for a jury as to whether Trinity Mission discriminated against her based on her sex and whether that discrimination lead to her termination. For these reasons, the Court DENIES Defendant's request for summary judgment on Ms. Vasquez's disparate treatment sex discrimination claim.

The Court finds Ms. Vasquez has failed to provide evidence from which a reasonable jury could conclude the alleged harassment rose to a level sufficiently severe or pervasive such that it altered the conditions of her employment and created an abusive work environment. Thus, Ms. Vasquez's claim for hostile work environment discrimination cannot survive summary judgment. Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment on Ms. Vasquez's hostile work environment claim.

With respect to Trinity Mission's assertion that Ms. Vasquez's common law claims fail as a matter of law because she failed to plead vicarious liability, the Court finds Ms. Vasquez

sufficiently pled her Complaint to include a claim for vicarious liability and has brought forth sufficient evidence for a reasonable jury to find vicarious liability. Accordingly, the jury must determine the question of fact: whether Ms. Vasquez's supervisor, Mr. Pettijohn, acted within the course and scope of his employment during the alleged incidents giving rise to this action. Because the issue of vicarious liability presents a question of fact for the jury, the Court DENIES Trinity Mission's Motion for Summary Judgment on vicarious liability.

The Court finds Ms. Vasquez submitted evidence enough to create a question of fact for a jury as to her claims for defamation *per se* and false light invasion of privacy arising from comments by her supervisor that a reasonable person could conclude suggested she, a married woman, was having an affair with a married co-worker. Thus, the Court DENIES Trinity Mission's request for summary judgment on these claims.

Ms. Vasquez failed to set forth sufficient facts to allow a reasonable jury to conclude Trinity Mission intentionally interfered with Ms. Vasquez's existing or potential economic relations. Specifically a defendant cannot interfere with its own contract, and Ms. Vasquez puts forth no evidence of any other economic relations she has, either existing or potential. Therefore, Ms. Vasquez's claim for intentional interference with prospective economic relations fails as a matter of law. The Court GRANTS summary judgment against Ms. Vasquez's claim for intentional interference with prospective economic relations.

With respect to Ms. Vasquez's claim for intentional infliction of emotional distress, this Court finds she has failed to provide evidence that would allow a reasonable jury to conclude that the conduct of Trinity Mission or its agent rose to the level of extreme or outrageous conduct necessary to sustain this claim. Therefore, the Court GRANTS Trinity Mission's Motion for Summary Judgment on Ms. Vasquez's claim for intentional infliction of emotional distress.

With these decisions, the following claims remain for trial: disparate treatment sex discrimination, defamation *per se*, and false light invasion of privacy.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) authorizes summary judgment where no genuine, disputed, triable issue of material fact remains in the case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In that case, "no genuine issue as to any material fact" exists: "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary judgment allows the Court and the parties to isolate and dispose of factually unsupported claims or defenses.

A party asserting a fact must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In this case Trinity Mission objected to Ms. Vasquez's asserted evidence, including the Equal Employment Opportunity Commission ("EEOC") investigatory materials, as inadmissible hearsay and lacking foundation. However, the evidence provided to support a summary judgment motion need only be capable of presentation in an admissible form. *See* Fed. R. Civ. P. 56(c)(2). Thus, the information reviewed by a court in response to a summary judgment motion may include hearsay if the plaintiff could call a witness to testify to the information or present the material in a

manner that does not constitute hearsay.  In this case, Trinity Mission's objections go to notes of conversations with people Ms. Vasquez presumably[1] could call in her case and who could testify based on their personal knowledge.  Therefore, the Court will consider this evidence at summary judgment.

In deciding a motion for summary judgment, the Court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Burke v. Utah Transit Auth.*, 462 F.3d 1253, 1258 (10th Cir. 2006) (citation omitted).  The Court therefore focuses on whether reasonable jurors "can properly proceed to find a verdict for the party . . . upon whom the *onus* of proof is imposed."  *Liberty Lobby*, 477 U.S. at 252 (emphasis in original).  With this standard in mind, the Court sets forth below the facts viewed in a light most favorable to Ms. Vasquez.

### III. FACTUAL BACKGROUND

The parties do not dispute the following facts.  Defendant Trinity Mission employed Ms. Vasquez from January 9, 2008, to approximately May 21, 2009, as a dietary manager overseeing food preparation and service for residents of a rehabilitation care center.  Ms. Vasquez managed approximately ten employees.  As part of the hiring process, Ms. Vasquez received a copy of Trinity Mission's employee handbook, read the policies therein, and agreed to adhere to them.

Ms. Vasquez received two performance evaluations while working for Trinity Mission. The first evaluation covered the period from her hiring until April 25, 2008, and found her performance overall satisfactory.  (ECF No. 34-1 at 5.)  David Pettijohn took over as Ms. Vasquez's direct supervisor and administrator of the facility in January 2009.  Ms. Vasquez received her next evaluation on March 4, 2009, from Mr. Pettijohn.  (ECF No. 34-3 at 4.)  The

---

[1] Trinity Mission made no assertions regarding the unavailability of these witnesses and did not provide any other basis on which the Court would exclude the testimony.

evaluation has both "Satisfactory" and "Needs Improvement" marked for overall evaluation. (*Id.*) The "Needs Improvement" has a circle around it with the initials DP next to it, indicating Mr. Pettijohn found Plaintiff's performance needing improvement. (*Id.*) The comment underneath the evaluation states: "Attendance with family health concerns is a problem." (*Id.*) All subcategories on the evaluation place Ms. Vasquez's performance in the satisfactory to exceptional range. (*Id.* at 2–3.) After this evaluation but retroactive to January 23, 2009, Ms. Vasquez received a pay increase. (ECF No. 34-4 at 2.)

The following incident occurred during Ms. Vasquez's employment:

A.  The marketing director at the time was Gary. He had come here from – had lost his job in California, had come here to work. He was – he was old enough to be my father, about my father's age. Renata didn't like him. If Renata didn't like you, then you were kind of just shunned. And we got along great. His wife was Italian. I'm Hispanic. His – we would go to lunch, me, him and Sue. And we, you now, formed a relationship. His wife would call. We called her Queenie. And we, you know, we talked to her, and he let us stay at - she would call, we'd always have lunch.

She would always call and we'd talk to her. His dad was ailing. His son's wife had gotten pregnant and found out that the baby had some kind of severe – severe illness and deformity, it was their first child. He was upset. I text him Monday morning – I wasn't there Friday. I text him Monday morning and said, Hope everything's okay, Gary. How are you, type of text. And I got a text back saying, I don't know how Gary is, but I'm fine. So I thought, Well, maybe I text the wrong person.

So when I got to work, to stand up, Pettijohn had the marketing phone on his hip because it had the case that hooks into your belt. And I said, Oh, that explains the text. And he kind of just kind of chuckles. And he goes — and Crystal, the assistant ADON says, What text? And David goes, Well, Cat was texting Gary this morning. And he gets up the phone and goes, Yeah, she was texting, Hi, Lover, how are you? I miss you, XOXOXO. And I said to him, That is not funny, I'm not having an affair with Gary, and that is out of line. And he just laughed.

Q.  Okay. Did he say you were having an affair with him?

A.  What do you think "lover" means? I mean, that's basically coming out saying that there's something going on.

(Vasquez Dep. 68:7–69:18, ECF No. 28-1.)

Trinity Mission suspended Ms. Vasquez on April 27, 2009, and formally terminated her employment on May 21, 2009.  By an undated document, a coworker filed a written complaint against Ms. Vazquez alleging Ms. Vasquez had grabbed her face on April 25, 2009.  On April 28, 2009, another employee filed a complaint alleging similar behavior.  A third employee submitted a letter on May 5, 2009, alleging Ms. Vasquez treated her rudely and intimidated her on April 27, 2009.  Following Ms. Vasquez's termination, she filed a claim with the Utah Antidiscrimination and Labor Division alleging her direct supervisor, David Pettijohn, discriminated against her based on her sex and used inappropriate sex-based comments toward her culminating in her termination.

In addition to the uncontroverted facts, Ms. Vasquez submitted evidence to support the following facts[2]:

Mr. Pettijohn had the authority to hire or fire anyone at the facility.  When Mr. Pettijohn took over, he instructed Ms. Vasquez and the other managers, who were mostly female, that at no time should she go above his head or complain to anyone aside from him, or he would find a way to fire her.  Mr. Pettijohn repeated this instruction to her and others at least two to three times.  Ms. Vasquez did not believe she could complain to another supervisor for fear she would lose her job.  Despite the contents of the employee handbook, Ms. Vasquez did not believe her employer observed a policy of zero tolerance of any coercion, intimidation, retaliation, interference, or discrimination if an employee chose to file a complaint or otherwise assist in an investigation.  Ms. Vasquez asserts she personally observed the regional manager of Trinity Mission, Brian Brinkerhoff, tell those who complained about Mr. Pettijohn to "suck it up."

---

[2]	Trinity Mission argues that Ms. Vasquez's Declaration does not represent evidence, and the Court should disregard it.  The Court disagrees and notes most of the assertions in the Declaration also appear in Ms. Vasquez's deposition, and those that do not, do not contradict the deposition.  (*Cf.* ECF No. 28-1 at 19–22, 30–33, 39, 42, 46, 50–51, 56–57, 66–69, 71–75, 78–80, 83 *with* ECF No. 33.)

During Ms. Vasquez's employment, Trinity Mission took two disciplinary actions against her. The first time, her former boss wrote her up for putting Oreo cookies out in the lobby rather than freshly baked cookies. The second time, Mr. Pettijohn wrote her up for insubordination for failing to call him the second day she missed work as a result of caring for a sick niece in the hospital.

In general, Ms. Vasquez had a difficult relationship with Mr. Pettijohn and put forth the following evidence in support of her claims. Mr. Pettijohn would cut off female employees who attempted to joke during meetings but allowed men to do so. Once, Mr. Pettijohn commented in a meeting with the department heads, who were mostly women, that men in a particular state have sex with animals. During one meeting, Mr. Pettijohn responded to a female manager by saying "where did you get that smart mouth from, your mother?" Mr. Pettijohn talked down to female department managers, asking them if they "need a box of tissues" because they might need to "go cry in the corner" when he told them something he perceived them not to like. Mr. Pettijohn would roll his eyes when the female managers would speak but would act respectfully when male managers spoke. Mr. Pettijohn frequently cut off female managers when they spoke if he disagreed with them. Mr. Pettijohn never treated male employees derogatorily.

During an evaluation, Mr. Pettijohn told Ms. Vasquez that if she could not balance her work and home life maybe she should stay home, be a mom, and take care of her children. He went on to threaten to "find a way to fire her" if one of her children ever got sick again. Mr. Pettijohn commented one or two times a week to a different female manager that women did not belong in the workplace, but rather should have children and stay home to care for their families. (ECF No. 34-11 at 2.) Mr. Pettijohn further made fun of Ms. Vasquez when she used polysyllabic words by saying things like "I didn't know you knew how to use such big words."

In particular, Ms. Vasquez recalls she used the word "congenial," to which Mr. Pettijohn responded "Cat can use big words now, can't she?" Mr. Pettijohn referred to the male managers as either "the boy's club" or "the men's club," saying "It's you girls and then it's just us boys club, type of thing all the time."

Ms. Vasquez testified that this behavior caused her to fear for her job, suffer from stress, and have headaches regularly for four months.

Regarding the complaints made just prior to her termination, Ms. Vasquez denies any type of physical altercation with any employee. Another employee claims to have overheard the complainants talking and saying they "got [Ms. Vasquez] good, and they made it up, and . . . got [her] fired." (Vasquez Dep. 82:2–6, ECF No. 28-1; *see also* ECF No. 34-8 at 3.) Further, Ms. Vasquez testified that Trinity Mission admitted it did not fire her because of the reported physical abuse. Specifically, in a phone call with human resources following a complaint letter from Ms. Vasquez, a human resources representative told her that "all [she] ever did was yell at [her] staff and that — that basically all [her] staff didn't like [her] and — it had nothing to do with the grabbing the face." (Vasquez Dep. 42:1–10, ECF No. 28-1.)

Additionally, Ms. Vasquez asserts Trinity Mission did not follow its strict policy requiring Trinity Mission immediately to escort an alleged physical abuser from the facility. Ms. Vasquez's former supervisor told her "you know the rules, you know you needed to be removed from the premises." (Vasquez Dep. 46:1–9, ECF No. 28-1.) Another employee confirmed that Trinity Mission had a policy of immediate removal following an allegation. (ECF No. 34-8 at 2.) After the alleged altercations, Ms. Vasquez continued to work for three days where she participated in an inspection of the facility by an outside entity. This failure to follow policy, Ms. Vasquez claims, undermines Trinity Mission's current assertion that it fired her because of

the complaints of physical abuse. Immediately following the inspection, Trinity Mission informed Ms. Vasquez it intended to suspend her for three to five days. Trinity Mission gave Ms. Vasquez a letter informing her of the bases for her suspension as follows: allegedly striking a subordinate's face, hiring a family member without Mr. Pettijohn's knowledge, and placing an employee on light duty without informing Mr. Pettijohn. Ms. Vasquez denies all of these allegations, and Trinity Mission has not put forth any evidence regarding either the hiring or light duty claims.

Ms. Vasquez texted Brian Brinkerhoff the morning of her suspension, telling him she felt Trinity Mission was on a witch-hunt. Following her suspension, Ms. Vasquez drafted a "formal" e-mail to Brian Brinkerhoff asking the human resource director for Trinity Mission to "handle this thing" because she felt she was "being railroaded" and that Mr. Pettijohn held a bias against her and could not perform his role objectively. (Vasquez Dep. 41:12–44:23, ECF No. 28-1.) Mr. Brinkerhoff forwarded the letter to human resources, who contacted Ms. Vasquez. Ms. Vasquez felt Mr. Pettijohn had subjected her to an unequal playing field and that she had no recourse because Trinity Mission had already made its decision to terminate her. (Vasquez Dep. 42:10–23, ECF No. 28-1.)

Two days after her phone conversation with Trinity Mission's human resource person, Mr. Pettijohn met with Ms. Vasquez, informed her "the company had made a conclusion," and asked her to resign. (Vasquez Dep. 45:2–5, ECF No. 28-1.) Ms. Vasquez refused to resign, and Trinity Mission terminated her. (Vasquez Dep. 45:5–7, ECF No. 28-1.) Ms. Vasquez asserts she never received notice, as per policy, of the reason for her termination.

Additionally, Ms. Vasquez asserts that despite her request for an investigation following her suspension, and again after her termination, that Trinity Mission never investigated the alleged incidents—the now purported reason behind her termination.

During the EEOC investigation a female co-worker reported that Mr. Pettijohn stated that Ms. Vasquez only hired her because the co-worker and Ms. Vasquez were sleeping together. (ECF No. 34-11 at 2.)

## IV.  DISCUSSION

### A.    SEX DISCRIMINATION–UADA & TITLE VII

This Court has jurisdiction to hear Ms. Vasquez's claims of sex discrimination because she timely filed charges of employment discrimination with the EEOC, received and acted upon the EEOC's statutory notice of her right to sue pursuant to 42 U.S.C. section 2000e–5(f)(1), and makes a claim under a federal statue, *see* 28 U.S.C. §1331.

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  The Utah legislature modeled the Utah Anti-Discrimination Act ("UADA") "after Title VII of the Civil Rights Act of 1964." *Gottling v. P.R. Inc.*, 2002 UT 95, ¶ 16, 61 P.3d 989, 995 (Utah 2002) (quoting the legislative history of the UADA).  Because the UADA sets forth the same elements as required by a Title VII claim, Utah courts impose the Title VII analysis to UADA claims.  *See Viktron/Lika v. Labor Comm'n*, 2001 UT App 394, ¶ 6, 38 P.3d 993, 995.  Thus, this Court will analyze Ms. Vasquez's federal and state discrimination claims simultaneously.

Further, the UADA subsumed any common law cause of action for wrongful termination for sex discrimination. *See Gottling*, 2002 UT 95, ¶ 9 (holding the plain language of the UADA shows an "explicit legislative intention to preempt all common law remedies for employment discrimination"). Hence, the Court will not separately analyze the wrongful termination claim because Ms. Vasquez admits it arises from the same facts on which she claims to have suffered sex discrimination under both federal and state statutory law.

In the instant case, Ms. Vasquez pled sex discrimination under Title VII and the UADA, alleging disparate treatment and hostile work environment. The Court will analyze these issues separately.

### 1. *Disparate Treatment*

A plaintiff can prove sex discrimination with either direct or circumstantial evidence. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008) (citation omitted). "Direct evidence demonstrates on its face that the employment termination was discriminatory. Circumstantial evidence permits the fact finder to draw a reasonable inference from facts indirectly related to discrimination that discrimination, in fact, has occurred." *Id.* (internal citations omitted). At the summary judgment stage, a plaintiff must put forth sufficient evidence for a rational jury to conclude—with either direct or circumstantial evidence—that the defendant intentionally discriminated against her. *See id.* (citation omitted).

In opposition to the summary judgment motion, Ms. Vasquez put forth circumstantial evidence to demonstrate that a rational jury could conclude Trinity Mission intentionally discriminated against her. "Where a plaintiff relies on circumstantial evidence, the Supreme Court has established a three step burden-shifting framework for determining whether a plaintiff's evidence raises an inference of invidious discriminatory intent sufficient to survive

summary judgment." *Id.* (citing *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–05 (1973)).

"This three-step analysis first requires the plaintiff to prove a prima facie case of discrimination." *Adamson*, 514 F.3d at 1145 (citation omitted); *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce a legitimate, non-discriminatory reason for its employment action. *Burdine*, 450 U.S. at 253. Third, if the defendant offers this evidence, the plaintiff must show her "gender, or other illegal consideration was a determinative factor in the defendant's employment decision, or show that the defendant's explanation for its action was merely pretext." *Adamson*, 514 F.3d at 1145 (citation omitted).

At the summary judgment stage in a Title VII case, a moving defendant prevails as a matter of law unless a plaintiff produces evidence from which a rational jury could infer the ultimate fact of discrimination or retaliation. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146–153 (2000). Such evidence can consist of facts sufficient to discredit the nondiscriminatory business reason the defendant produced, although the Supreme Court emphasized in *Reeves* that responsibility remains on the plaintiff to oppose the motion with proof sufficient to support a finding of discrimination. *Id.* at 147. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517 (1993)). A plaintiff's prima facie case, combined with sufficient evidence to discredit the employer's asserted justification, may suffice to preclude summary judgment.

### a. Prima Facie Case

Under *Burdine*, to prove intentional discrimination, a plaintiff must first establish a prima facie case that raises an inference of discriminatory intent. 450 U.S. at 252–54. "The burden of establishing a prima facie case of disparate treatment is not onerous." *Id.* at 253. Once plaintiff establishes a prima facie case, she enjoys a presumption that defendant discriminated against her. *Id.* If the plaintiff puts forth sufficient evidence, and the employer remains silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case. *Id.* at 253–54.

Under *McDonnell Douglas/Burdine*, a plaintiff must first establish a prima facie case by showing that (1) she belonged to a protected class; (2) she had sufficient qualifications for her job and performed satisfactorily; (3) the employer discharged her despite her qualifications; and (4) some additional evidence gives rise to an inference of discrimination. *Alfonso v. SCC Pueblo Belmont Operating Co.,* 912 F. Supp. 2d 1018, 1026 (D. Colo. 2012). "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Adamson*, 514 F.3d at 1151 (citations and internal quotation marks omitted).

> A plaintiff has established a prima facie case if the undisputed facts, viewed in the light most favorable to the plaintiff, would allow a reasonable jury to draw an inference of discrimination. An inference of discrimination arises when there is a "logical connection" between each element of the prima facie case and the alleged discrimination.

*Alfonso*, 912 F. Supp. 2d at 1026 (internal citations omitted).

In the instant case, the parties agree Ms. Vasquez qualifies as a member of a protected class: she is female. Additionally, Trinity Mission does not claim it discharged Ms. Vasquez because she lacked qualifications. Trinity Mission does claim Ms. Vasquez cannot prove she

performed her job satisfactorily. Courts permit plaintiffs to refer to past performance evaluations as evidence of job performance and do not consider prior disciplinary action necessarily inconsistent with adequate job performance. *See id.* at 1026–27. Courts will discount reviews or disciplinary actions that precipitate the termination and that the parties dispute. *Id.* at 1027. In this case, Ms. Vasquez's performance review and disciplinary action prior to Mr. Pettijohn's becoming her supervisor suffice to allow a rational jury to conclude she performed her job adequately. The disciplinary action following Mr. Pettijohn's becoming Ms. Vasquez's supervisor and the job review all fall within the discrimination charge in this case; that is, Mr. Pettijohn intended to fire Ms. Vasquez from the time he started because he thought women should stay at home and care for their families. Viewing the evidence in a light most favorable to Ms. Vasquez, these actions do not prevent her from showing adequate job performance.

Defendant also claims Ms. Vasquez has failed to provide evidence sufficient to allow a reasonable jury to make an inference of discrimination. Ms. Vasquez need not specifically show that Trinity Mission terminated her because of a discriminatory motive. *Id.* Rather, Ms. Vasquez must "allege facts sufficient to permit an inference that, more likely than not, her termination was motivated by discrimination." *Id.* (citation omitted). "Evidence relevant to this inquiry includes: 'actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus . . . , preferential treatment given to employees outside the protected class . . . or, more generally, upon the timing or sequence of events leading to plaintiff's termination.'" *Id.* (quoting *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (alterations in original)). Plaintiffs may rely on derogatory remarks made by a supervisor, because the remarks "'reflect[] a discriminatory animus' on the part of [the supervisor], one of the two decision makers in plaintiff's termination." *Alfonso*, 912 F. Supp. 2d at 1027 ("holding that age-related

remarks made by a decision maker were sufficient to establish a prima facie case of termination on the basis of age where there was a temporal nexus between the remarks and the decision to terminate" (citing *Hare v. Denver Merch. Mart, Inc.*, 255 Fed. App'x 298, 303 (10th Cir. 2007)).

Ms. Vasquez put forth evidence from which a rational jury could conclude that her supervisor, Mr. Pettijohn, subjected her to disparate treatment because he held a gender bias against females and that he threatened to "find a way to fire her." Within five months of Mr. Pettijohn's taking over supervision of Ms. Vasquez, he terminated her. During that time, according to the evidence Ms. Vasquez submitted, she and her female coworkers experienced gender discrimination through disparate treatment in the workplace. Specifically, Mr. Pettijohn prevented females from participating in company meetings by rolling his eyes at them; referring to "the boy's club"; joking with men but cutting off women; asking if the women needed a box of tissues when he disagreed with them, implying that females were too emotional; commenting on their use of "big" words; and accusing at least one of them of having a "smart mouth," which he then tried to attribute to her mother. Furthermore, Ms. Vasquez alleges Mr. Pettijohn told her and other female employees that they did not belong in the workplace and maybe they should stay home, be mothers, and take care of their children. A rational jury could determine Mr. Pettijohn's actions and remarks reflect a discriminatory animus, giving rise to an inference of discrimination. Thus, Ms. Vasquez has established a prima facie case of gender discrimination for purposes of summary judgment, shifting the burden to the Trinity Mission.

### b. Proffered Legitimate Non-Discriminatory Reason for Termination

Under *Burdine*'s second step the defendant must articulate a "legitimate, non-discriminatory reason" for its action. *Burdine*, 450 U.S. at 254. The defendant need only produce some evidence sufficient to create an issue of fact. *Id.* ("The defendant need not

persuade the court that it was actually motivated by the proffered reasons."). In the instant case, Trinity Mission has offered evidence it terminated Ms. Vasquez for poor work performance, reprimands, unsatisfactory management, and the use of verbal and physical violence against subordinate employees. Under *Burdine*, articulation of these reasons rebuts the presumption of discrimination created by establishment of the prima facie case. *Id.* at 255, 255 n.10.

"Poor performance is a quintessentially legitimate and nondiscriminatory reason for termination." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005) (citing *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002)). Trinity Mission argues it terminated Ms. Vasquez because she did not perform her job duties satisfactorily. Near or at the time of her termination, three of Ms. Vasquez's subordinate employees had filed written complaints against her with the company outlining complaints of physical violence, verbal abuse, and poor management.

Having articulated reasons for Ms. Vasquez's discharge and provided some evidence to support those reasons, Defendant has satisfied its burden of production and rebutted the presumption created by the prima facie case.

      **c.**      **Pretext**

The third part of the inquiry requires the plaintiff to come forth with evidence "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, at 253. Because Trinity Mission proffered evidence of a facially non-discriminatory reason for the employment action, "the presumption of discrimination established by the prima facie showing 'simply drops out of the picture.'" *Bryant*, 432 F.3d at 1125(quoting *St. Mary's Honor*, 509 U.S. at 511).

At summary judgment, the Court does not decide the "true" reasons for termination because that determination rests largely upon the credibility of the parties. *See Reeves*, 530 U.S. 133, 150–51; *Bryant*, 432 F.3d at 1125; *Liberty Lobby*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). The Court must decide whether sufficient evidence exists to allow a rational jury to conclude that Trinity Mission's stated justifications for terminating the Ms. Vasquez reflect pretext for discriminatory motivations. *Alfonso*, 912 F. Supp. 2d at 1028; *see also Bryant*, 432 F.3d at 1125 ("Evidence tending to show pretext permits an inference that the employer acted for discriminatory reasons."); *Celotex*, 477 U.S. at 322 ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). "'[I]f a plaintiff advances evidence establishing a prima facie case and evidence upon which a factfinder could conclude that a defendant's alleged nondiscriminatory reasons for the employment decisions are pretextual, the case should go to the factfinder.'" *Bryant*, 432 F.3d at 1125 (citation omitted).

A plaintiff can demonstrate pretext in two ways: "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *See Burdine*, 450 U.S. at 256 (citation omitted).

> The trier of fact may infer
>
> the ultimate fact of discrimination from the falsity of the employer's explanation. . . . "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice

> to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination."

*Reeves*, 530 U.S. at 147 (quoting *St. Mary's Honor*, 509 U.S. at 511). A plaintiff may offer evidence of pretext through showing "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Bryant*, 432 F.3d at 1125 (citations omitted).

> At [the summary judgment] stage, if a plaintiff advances evidence establishing a prima facie case and evidence upon which a factfinder could conclude that the defendant's alleged nondiscriminatory reasons for the employment decisions are pretextual, the case should go to the factfinder.

*Bryant*, 432 F.3d at 1125 (citation omitted).

Ms. Vasquez offers the following facts to show pretext: she put forth evidence that a co-worker overheard the complainants of physical abuse commenting that they "got [Ms. Vasquez] good, and they made it up, and . . . got [her] fired." Further, Ms. Vasquez submitted evidence that Trinity Mission failed to follow its own termination protocol and company policy by not investigating the claims, by allowing Ms. Vasquez to work two days after her subordinate employee(s) complained of abuse and mistreatment, and by not telling Ms. Vasquez why it fired her. In addition, Ms. Vasquez testified to having a conversation with a human resources representative who admitted Trinity Mission did not fire her because of the allegations about grabbing subordinates' faces.

This evidence creates a material issue of fact about the reason for Ms. Vasquez's termination. When the Court considers this evidence coupled with the evidence of disparate treatment, the Court can only conclude that Ms. Vasquez has demonstrated a material issue of

fact that a jury must resolve.  Accordingly, for these reasons, this Court DENIES Trinity

Mission's motion for summary judgment based on Ms. Vasquez's claims of disparate treatment

sex discrimination.

### 2. *Hostile Work Environment*

In addition to Ms. Vasquez's claim of disparate treatment sex discrimination, she claims

Trinity Mission engaged in sex discrimination by allowing a hostile work environment to

pervade the workplace and result in her termination.

Trinity Mission put forth evidence that Ms. Vasquez never reported any harassment as

provided for by company policy and moves for summary judgment in part because of this failure.

An employer may prove an affirmative defense to a hostile work environment claim by

exercising "reasonable care to prevent and correct promptly any sexually harassing behavior"

and showing the plaintiff "unreasonably failed to take advantage of any preventive or corrective

opportunities provided by the employer," including a reporting requirement or policy.  *Pinkerton

v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1061–62 (10th Cir. 2009).  An employer may not

claim this affirmative defense when a supervisor's actions "'culminate[] in a tangible

employment act, such as discharge, demotion, or undesirable reassignment.'"  *Id.* at 1059

(quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).  Because the evidence

offered for purposes of summary judgment could support a finding of a tangible employment

action by the supervisor alleged to have created the hostile environment, Trinity Mission does

not receive the benefit of the affirmative defense.

To survive summary judgment on a hostile work environment claim, a plaintiff must

provide evidence from which a rational jury could conclude, based on the totality of the

circumstances, sexual harassment pervaded the workplace or rose to a level so severe such that it

altered the terms or conditions of employment.  *See Chavez v. New Mexico*, 397 F.3d 826, 832–33 (10th Cir. 2005).  Furthermore, "[t]he 'plaintiff must produce evidence that she was the object of harassment *because of her gender.*'"  *Id.* at 833 (emphasis in original) (quoting *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998)).  In determining whether conduct rises to this level, the Court considers:  "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Id.* at 832–33 (citing *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998).  "[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Faragher*, 524 U.S. at 787; *see also Morris*, 666 F.3d at 664.

"Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim."  *Morris v. City of Colorado Springs*, 666 F.3d 654, 664 (10th Cir. 2012); *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 316 (4th Cir. 2008)  ("Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard.  Some rolling with the punches is a fact of workplace life.").  "A recurring point in [Supreme Court] opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  *Faragher*, 524 U.S. at 788 (internal citations omitted).  "Properly applied, th[e standards] will filter out

complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* (citation omitted).

Ms. Vasquez unquestionably perceived her environment as abusive and hostile and attributes that abuse and hostility to her gender. In assessing whether an objective, reasonable person could similarly perceive the environment, the Court must look at the evidence provided through a precedential lens in determining whether Ms. Vasquez's claim will survive summary judgment. "A plaintiff does not make a sufficient showing of a pervasively hostile work environment 'by demonstrating a few isolated incidents of . . . sporadic . . . slurs. . . . Instead, there must be a steady barrage of opprobrious . . . comments.'" *Morris*, 666 F.3d at 666 (quoting *Chavez*, 397 F.3d at 832).

Other courts have found that isolated events and offensive utterances, over the course of employment, did not amount to an actionable hostile work environment under Title VII. *See Morris*, 666 F.3d at 658–59, 664–66 (upholding summary judgment for the employer on hostile work environment claims where plaintiff claimed her supervisor made demeaning comments to her and treated female employees differently than male, flicked her with his finger in her head twice, threw pericardium tissue at her, and joked about it); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365–66 (10th Cir. 1997) (upholding summary judgment for the employer where plaintiff provided evidence of five separate incidents of sexist comments or actions by a co-worker who became her supervisor, over sixteen months); *Gaff v. St. Mary's Reg'l Med. Ctr.*, 506 Fed. App'x 726, 727–29 (10th Cir. 2012) (upholding summary judgment for employer where co-worker commented that plaintiff's husband was going to leave her for another woman, was "a little too friendly and smiled and stared at her a little too much," and told her she needed a "good f[---]").

In the instant case, Mr. Pettijohn did not physically threaten or harm Ms. Vasquez. Ms. Vasquez's testimony does not support a claim that she labored under a steady barrage of gender motivated incidents or comments. Rather, Ms. Vasquez put forth evidence of isolated incidents of comments, generally referencing an anti-woman sentiment, one alleged incident where Mr. Pettijohn made a vague comment about men having sex with animals, and one alleged incident where Mr. Pettijohn implied Ms. Vasquez was having an affair with a co-worker. Further, Ms. Vazquez expresses great frustration with Mr. Pettijohn's instructions not to go over his head with complaints. She does not provide any evidence, however, to suggest that Mr. Pettijohn gave that instruction because of her gender. (*See* Vasquez Dep. at 30:9-33:25 (indicating he gave the instruction to both male and female employees), ECF No. 28-1 at 9-10.)

Apart from these isolated incidents, the only evidence regarding the frequency of anti-woman statements comes from the EEOC file. Specifically, Amanda White, another Trinity Mission employee, told the EEOC investigator that Mr. Pettijohn made anti-woman statements one to two times per week. Yet Ms. Vasquez offered no evidence suggesting she heard or found out about these comments prior to her termination. Ms. Vasquez's deposition and declaration recall a couple of incidents but nowhere mention the frequency of such comments. Similarly, no evidence suggests Ms. Vasquez knew about allegations of a sexual relationship between Ms. Vasquez and Ms. White resulting in Ms. White's hiring until after Ms. Vasquez filed this case. Because Ms. Vasquez did not know about the comments, they do not contribute to the hostile work environment she alleges in this case. *See Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1146 (10th Cir. 2008) (citation omitted) (noting the court will consider evidence regarding the work atmosphere "as long as [plaintiff] presents evidence that he knew about the offending behavior").

While Mr. Pettijohn and Ms. Vasquez obviously did not get along, Mr. Pettijohn's actions do not rise to the level that an objective observer would find the environment hostile or abusive. The totality of the circumstances does not contain sufficient facts to allow a reasonable jury to conclude the harassing conduct qualified as so severe or pervasive that it altered the terms or conditions of her employment. For these reasons, the Court GRANTS Trinity Mission's Motion for Summary Judgment as to Ms. Vasquez's Title VII hostile work environment claim.

## B.  UTAH COMMON LAW CLAIMS[4]

### 1.  *Pleading Vicarious Liability*

Trinity Mission's Motion for Summary Judgment argues that Ms. Vasquez's common law tort claims fail because Ms. Vasquez failed to plead vicarious liability. A plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007). In light of well-pled factual allegations, courts will assume the veracity of the allegations and may draw plausible inferences based on the alleged misconduct. *Twombly*, 550 U.S. at 556.

Ms. Vasquez's Complaint asserts her direct supervisor, a high level employee for Trinity Mission, subjected her to actionable behavior. The Complaint further alleges that Trinity Mission did all acts alleged through its employees or representatives in the course and scope of their employment. (ECF No. 2 at ¶ 4.) On these allegations, the Court finds Ms. Vasquez's Complaint sufficiently pled vicarious liability.

### 2.  *Vicarious Liability*

Having determined Ms. Vasquez sufficiently pled vicarious liability, the Court must decide if a material dispute of fact exists regarding whether Mr. Pettijohn acted under the scope of his employment with Trinity Mission when he commented on an errant text message received

---

[4] The Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. section 1367.

from Ms. Vasquez in front of at least one other Trinity Mission employee. Trinity Mission only has liability for Mr. Pettijohn's actions if he acted within the course and scope of his employment during the above-referenced incident. *See Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1040 (Utah 1991) (noting the doctrine of *respondeat superior* holds employers "vicariously liable for the torts their employees commit when the employees are acting within the scope of their employment"). Deciding whether an alleged offending employee acted within the course and scope of employment often poses a question of fact for submission to the jury. *Id.* "[W]henever reasonable minds may differ as to whether the [employee] was at a certain time involved wholly or partly in the performance of [the employer's] business or within the scope of employment," the jury must decide the issue. *Id.* (citation omitted). When an employee's activity falls so clearly within or without the scope of employment that reasonable minds would not differ, the court may decide the issue as a matter of law. *Birkner v. Salt Lake Cnty.*, 771 P.2d 1053, 1057 (Utah 1989) (citation omitted).

Utah courts use a three-part test, outlined in *Birkner*, to make scope of employment determinations. An employee's conduct must fall within the general kind of conduct the employer employs the employee to perform; the employee's conduct must occur within the employee's work hours and the work's ordinary spatial boundaries; and the purpose of serving the employer's interest must motivate the employee's conduct at least in part. *Id.* at 1056–57 (following Restatement (Second) of Agency § 228 (1958) (defining "scope of employment")). In *Birkner*, the court indicated acts falling within the scope of employment include "those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." *Id.* at 1056 (quoting *Prosser and*

*Keeton on the Law of Torts* § 70, at 502 (5th ed. 1984)). Additionally, Utah courts have found "[s]cope of employment questions are inherently fact bound." *Newman v. White Water Whirlpool*, 2008 UT 79, ¶ 10, 197 P.3d 654 (citation omitted) (upholding reversal of summary judgment on the grounds that reasonable minds might differ as to whether employee/agent acted within the course and scope of employment at the time of an auto accident, thus presenting a genuine issue of material fact for the jury).

For purposes of this inquiry, the Court will review each prong of the *Birkner* test separately.

### a. Agent/Employee Conduct

The first scope of employment criterion set forth in *Birkner* requires that an employee's conduct constitute the kind the employer hired him/her to perform or "'the employee must be about the employer's business and the duties assigned by the employer, as opposed to being wholly involved in a personal endeavor.'" *Christensen v. Swenson*, 874 P.2d 125, 128 (Utah 1994) (quoting *Birkner*, 771 P.2d at 1056–57).

Mr. Pettijohn's conduct consisted of receiving and commenting about a text message he mistakenly received from Ms. Vasquez, a subordinate employee, in front of at least one other employee. Ms. Vasquez argues that Mr. Pettijohn's conduct involved the use of a company phone, that he made his statements in front of co-workers, and therefore the comments involved "work-related" matters making his conduct employment related. Trinity Mission argues that Mr. Pettijohn merely made a joke during work hours and that Trinity Mission did not employ Mr. Pettijohn to make jokes. Trinity Mission further asserts that Mr. Pettijohn did not make the comment in the scope of his employment nor did making such a comment fulfill a duty required by the company.

From the evidence submitted, a jury could find that Trinity Mission hired Mr. Pettijohn to supervise employees, including Ms. Vasquez, by holding meetings, among other things. As part of his job, Trinity Mission provided a cell phone. A jury could find a joke/comment made incident to a meeting falls within the employer's business. For these reasons, examination of the first *Birkner* criterion becomes a question of fact for a jury to determine whether Mr. Pettijohn's conduct—alleging/joking about an affair between coworkers in the context of a meeting—falls under the scope of employment as part of his supervisory duties.

### b. Work Hours and Spatial Boundaries of Employment

The second *Birkner* criterion states "the employee's conduct must occur within the hours of the employee's work and the ordinary spatial boundaries of the employment." *Birkner*, 772 P.2d at 1057 (citations omitted). Ms. Vasquez asserts Mr. Pettijohn made the comment during work hours and within the spatial boundaries of the Trinity Mission facility when managers, including her, gathered for a managerial meeting called by Mr. Pettijohn. Trinity Mission does not dispute this point.

### c. Conduct Motivated by Employer Interest

The third *Birkner* criterion provides that "the employee's conduct must be motivated, at least in part, by the purpose of serving the employer's interest." *Birkner*, 772 P.2d at 1057 (citation omitted). Courts use varied approaches in determining whether the employer's interest motivates the employee conduct by looking at other factors aside from the alleged conduct itself.

Where reasonable minds differ as to whether serving the employer's interest motivated the employee's conduct, at least in part, a jury must determine the issue. *Christensen*, 874 P. 2d at 129. While no Utah case law addresses similar facts, other jurisdictions have addressed analogous circumstances.

In *Sanders v. Day*, a case with facts similar to those alleged, the plaintiff appealed the trial court's award of summary judgment under the doctrine of *respondeat superior* for the charge of slander brought against her employer for comments made by an agent of the company at an industry golf outing. 468 P.2d 452, 453–54 (Wash. App. 1970). In *Sanders*, the corporate vice president commented to a number of individuals that he and the plaintiff "had engaged in an act of sexual impropriety." *Id.* at 453. The parties did not dispute the facts. *Id.* Rather, they disputed the inferences drawn therefrom. *Id.* "The Court held that the ultimate and critical question—whether [defendant/agent] acted within the scope and course of his employment—is necessarily inferential." *Id.* at 455. Further, quoting the Restatement of Agency, the Court noted:

> "If the master employs a servant to speak for him, he is subject to liability if the servant makes a mistake as to the truth of the words spoken or as to the justification for speaking them, or even if he speaks with an improper motive, provided that he acts at least in part to serve his employer's purposes. The master may be liable even though the servant knows the statement to be untrue, * * * (D)efamation is effective, in part at least, because of the personality of the one publishing it. Thus, one who appears to have authority to make statements for the employer gives to his statements the weight of the employer's reputation. For this reason, the liability of the master may be based upon apparent authority."

*See Sanders*, 468 P.2d at 455 (quoting Restatement (Second) of Agency § 247 cmt. c (1958) (alterations in original)).

The plaintiff in *Sanders* argued that the [agent]'s "motive in defaming her character was a misguided desire to ingratiate himself" with others in the industry for the company's benefit and "that she should have an opportunity to examine [the agent] and other officers of [the corporation] in the presence of the trier of fact to establish that [the agent's] slanderous utterance should not have come as any surprise—that his public relations personality was that of the hail

fellow with a ready anecdote or ribald story." *Id.* at 454. The appellate court reversed summary judgment and remanded the case for trial, "[e]xpressing no opinion as to the merits, [the court] h[eld] that [plaintiff] is entitled to have the inferences drawn by the trier of fact. At trial, of course, the burden of persuasion will be [plaintiff']s." *Id.* at 456.

In the instant case, Trinity Mission asserts Mr. Pettijohn acted outside the scope of his employment when he joked, during work hours, that Ms. Vasquez was having an affair with a co-worker and that no reasonable person would believe his comment constituted anything other than a joke. Trinity Mission cites evidence that Ms. Vasquez's immediate reaction, by correcting Mr. Pettijohn, followed by Mr. Pettijohn's laughing at the situation, instantly corrected any false impression by any person listening and confirmed he merely made a joke.

Ms. Vasquez, however, asserts Mr. Pettijohn was not joking; rather, he acted as her direct supervisor under the scope of his employment with Trinity Mission. Ms. Vasquez further argues Trinity Mission knew of and supported Mr. Pettijohn's management style, as evidenced by Mr. Pettijohn's instruction to his employees that employees should not go above his head with complaints, and by upper management, instructing employees to "suck it up." Further, Ms. Vasquez argues Mr. Pettijohn used intimidation, coercion, and off-color humor during meetings, and in his day-to-day management.

A jury may infer from the information provided that Mr. Pettijohn served his employer's purpose in making his comments. The jury may determine Mr. Pettijohn believed he served his employer's interests by using intimidation or off-color humor in responding to potential disciplinary problems between employees and co-workers. A jury may also conclude that Trinity Mission found Mr. Pettijohn's management style effective because it knew of and

acquiesced to it. All of these factors may support a positive finding in the third inquiry of the *Birkner* test for scope of employment.

The Court DENIES summary judgment because the evidence could support a finding that Mr. Pettijohn acted within the scope of his employment, and resolution of the question requires submission to the jury.

### 3.    *Defamation Per Se*

Ms. Vasquez pled defamation *per se*, alleging that comments made by Trinity Mission's agent defamed her by publishing a false statement to co-workers accusing her of having an affair with a married co-worker. To maintain a claim for basic defamation, a plaintiff must show the defendant "published the statements concerning him, that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damage." *West v. Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah 1994) (footnotes and citations omitted). A statement constitutes defamation "if it impeaches an individual's honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule." *Id.* at 1008 (citing *Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1998)). "[I]n determining whether a particular statement fits within the rather broad definition of what may be considered defamatory, the guiding principle is the statement's tendency to injure a reputation in the eyes of its audience," when viewed in context. *Id.* at 1008–09 (citation omitted); *see also Mast v. Overson*, 971 P.2d 928, 932 (Utah Ct. App. 1998). Whether a statement can sustain a defamatory meaning presents a question of law. *Cox*, 761 P.2d at 561; *see also* Restatement (Second) of Torts § 614 (1977). If the Court determines the statement can sustain such a meaning as a matter of law, the trier of fact must determine whether its audience understood the statement as defamatory. *Id.*

When a person uses defamatory words actionable *per se*, the law presumes the existence of both malice and damages. *Larson v. SYSCO Corp.*, 767 P.2d 557, 560 (Utah 1989). To constitute slander *per se*, the defamatory words must "fall into one of four categories: (1) charge of criminal conduct, (2) charge of a loathsome disease, (3) charge of conduct that is incompatible with the exercise of a lawful business, trade, profession, or office; and (4) charge of the unchastity of a woman." *Allred v. Cook*, 590 P.2d 318, 320 (Utah 1979) (citation omitted).

The parties do not dispute the statements and events concerning the comment or publication giving rise to Ms. Vasquez's claim for defamation *per se*. Ms. Vasquez sent a text message to the marketing director of Trinity Mission. Ms. Vasquez has a husband of twenty-five years and four children. Ms. Vasquez and her husband have a friendship with the marketing director and his wife. According to Ms. Vasquez, she thought she sent a benign text message to her friend, Gary, the marketing director, inquiring about his family issues. Mr. Pettijohn received the message. When she returned to work after the weekend, Ms. Vasquez attended a meeting with a co-worker. At that meeting Mr. Pettijohn said to a co-worker, "Cat was texting Gary this morning . . . Hi, lover, how are you? I miss you, XOXOXO." Ms. Vasquez told Mr. Pettijohn, "that's not funny, I'm not having an affair with Gary, and that is out of line." Mr. Pettijohn laughed in response. Ms. Vasquez understood Mr. Pettijohn to have told their co-worker that she was having an affair with the marketing director.

The words uttered by Mr. Pettijohn, an agent of Trinity Mission, may fall into the fourth category of slander *per se* as communicated or published to a third party, their co-worker: the implication or allegation that Ms. Vasquez, a married woman, had engaged in unchaste behavior by having an alleged "affair" with the married marketing director. Trinity Mission argues that no reasonable person would view this comment as a factual statement or as anything other than a

joke, and therefore, the statement cannot constitute defamation. Additionally, Trinity Mission argues Ms. Vasquez immediately corrected Mr. Pettijohn and that Mr. Pettijohn laughed at the situation, instantly correcting any false impression held by any person listening. Thus, no damage to her reputation resulted. Ms. Vasquez, however, asserts that Mr. Pettijohn did not comment about her alleged affair in front of a co-worker in jest and consequently damaged her reputation.

The Court's inquiry focuses on whether a jury could find Mr. Pettijohn's comment implied Ms. Vasquez engaged in an alleged affair and thus unchaste behavior, and whether that statement falls within the fourth category of defamation *per se*, the charge of unchastity of a woman. This Court finds a jury could construe Mr. Pettijohn's comment as charging Ms. Vasquez, a woman, with unchastity.

A jury may find an allegation of infidelity constitutes slander *per se* and provides the basis for damage to Ms. Vasquez's reputation among her coworkers and the public. Therefore, the determination of how a reasonable person would construe the offending statement at issue should go to a jury. For this reason, the Court DENIES Trinity Mission's request for summary judgment as to the defamation *per se* claim.

### 4.    *False Light Invasion of Privacy*

Plaintiff has pled false light invasion of privacy based on this same incident involving an errant text message.

Utah has adopted the Restatement (Second) of Torts section 652E (1977) for invasion of privacy torts, which states as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor has

knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 907 (Utah 1992) (quoting and noting recognition of false light doctrine as delineated in § 652E of Restatement (Second) of Torts (1977)).

However, the Utah Supreme Court recognized a modification of this rule when the plaintiff represents a private, rather than public figure. *Id.* at 909. Specifically, Ms. Vasquez must make a threshold showing of only negligence, rather than knowledge or recklessness, to maintain a claim for invasion of privacy, provided she can show the implication would highly offend a reasonable person. *Id.* at 907.

In *Russell*, the plaintiff appealed the trial court's dismissal of her claim for invasion of privacy relating to a newspaper that allegedly published an article making public issues from her private life that "placed her in a false light before the public." *Id.* at 902, 906 (holding genuine issues of material fact precluded summary judgment). The court determined that an invasion of privacy claim protects an individual's interest in being let alone. This interest is distinct from the interest in reputation. Further, an action for invasion of privacy may be the only available remedy when the statements complained of are not themselves false, but merely place the plaintiff in a false light.

*Id.* at 906–07 (citation omitted).

The Utah Court of Appeals again addressed this issue in *Stien v. Marriott Ownership Resorts, Inc.*, 944 P.2d 374, 377 (Utah Ct. App. 1997). In *Stien*, the plaintiff claimed false light invasion of privacy where the defendant produced a videotape, purportedly as a joke, and then published the videotape to its employees at a company party. *Id.* at 376–77. At the time of taping, the defendant asked the interviewees, including plaintiff's husband, to comment on a hated household chore, but in the finished videotape, the defendant captioned the responses as "What's sex like with your partner?" *Id.* at 376. The plaintiff sued after the defendant showed

the videotape at the party, claiming false light invasion of privacy, because it subjected her to "shame [and] humiliation." *Id.* at 378. With respect to the offensive nature of the statement, the *Stien* court concluded the plaintiff had not established a viable claim for invasion of privacy because while no one disputed the videotape proceeded "in poor taste and its presentation rather ill-advised," taken in context, the defendant clearly intended the video as a joke, and the content would not highly offend an ordinary reasonable person; thus the claim failed as a matter of law. *Id.* at 379.

"[A]n action for 'false light' invasion of privacy cannot survive when the publication or statement sued upon cannot be reasonably viewed as a factual claim and is nothing more than a joke or a spoof." *Stien*, 944 P.2d at 380–81 (citing *Partington v. Bugliosi*, 825 F. Supp. 906, 925 (D. Haw. 1993), *aff'd*, 56 F.3d 1147 (9th Cir. 1995)); *Hicks v. Casablanca Records*, 464 F. Supp. 426, 433 (S.D.N.Y. 1978); *Byrd v. Hustler Magazine, Inc.*, 433 So.2d 593, 595 (Fla. Dist. Ct. App. 1983); *Walko v. Kean Coll.*, 235 N.J. Super. 139, 155 (Ch. Div. 1988)). In *Stien*, the court stated, "While the 'false light' tort protects individuals from 'major mispresentation[s] of . . . character, history, activities or beliefs', if a statement cannot reasonably be taken as factual, as with the contrived statements in the videotape about sex with the participants' partners, the statement does not amount to false light invasion of privacy because the public—or in this case the 200 party-goers—did not receive a false impression about plaintiff." *Stien*, 944 P.2d at 381 (alterations in original) (internal citations omitted).

The determination of whether a statement would highly offend a reasonable person ordinarily falls "within the province of the jury"; however, the trial court must make a threshold determination of offensiveness in discerning whether a cause of action exists in a false light context. *Id.* at 379 (citing *Vassiliades v. Garfinckel's*, 492 A.2d 580, 588 (D.C. 1985); *Sofka v.*

*Thal*, 662 S.W.2d 502, 511 (Mo. 1983) (en banc)).  In making the threshold determination whether a publication rises to the level of highly offensive to a reasonable person, the Court considers facts such as "'the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded.'"  *Stien*, 944 P.2d at 379 (quoting *Miller v. Nat'l Broad. Co.*, 232 Cal. Rptr. 668, 679 (Cal. Ct. App. 1986)).

In the instant case, Ms. Vasquez alleges Mr. Pettijohn published, to at least one other co-worker, that she, a married woman, was having an illicit affair with another co-worker, Gary, a married man, placing her in a false light.

Ms. Vasquez argues Mr. Pettijohn made this comment knowing its falsity and not in a joking manner.  Further, Ms. Vasquez argues that Mr. Pettijohn's comments would highly offend a reasonable person.  Trinity Mission asserts that Mr. Pettijohn's comment constituted a mere off-the-cuff joke, and no reasonable person would believe his comments or take them as anything other than a joke made during work hours regarding the errant text message he received.  All parties agree the statement was false.  A jury could find, based on the evidence submitted, that Mr. Pettijohn made the statement knowingly or recklessly or negligently.

In making a threshold determination of offensiveness, and viewing the facts in a light most favorable to Ms. Vasquez, the Court finds that publication of an alleged affair by a supervisor to subordinates inside the work setting may indeed have intruded on Ms. Vasquez's privacy and placed her in a false light.  Mr. Pettijohn made a public issue of Ms. Vasquez's private life, in publishing a purported affair to at least one co-worker.  A person accusing another of an illicit affair makes a highly explosive allegation.  Depending on the circumstances, a reasonable person could view the statement as highly offensive, if taken as a fact or a legitimate

accusation as opposed to an obviously untrue joke. An alleged illicit workplace affair, involving two married persons, could hurt one's reputation and affect the work environment negatively. Further, people often cast statements as "jokes" that they believe true, hence the adage "many a true word is said in jest." Thus, whether Mr. Pettijohn "joked" when he made the statement does not provide the touchstone for liability. Rather, the Court must focus on whether a reasonable person would find the statement highly offensive. Unlike the "joke" in *Stien*, a reasonable person could understand the statement here to disclose a truth, which then would be highly offensive. For these reasons, reasonable minds can disagree as to whether Mr. Pettijohn's comment constituted a joke or rose to the level of highly offensive. Therefore, the Court finds the question belongs to the jury and thus precludes summary judgment on this cause of action.

### 5. *Tortious Interference with Economic Advantage*

To recover for a claim of tortious interference with existing or prospective business relationships (collectively, "tortious interference with economic advantage"), a plaintiff must show conduct on the part of the defendant that "'intentionally and improperly interferes with the performance of a contract . . . between another and a *third* person by inducing or otherwise causing the *third* person not to perform the contract.'" *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 301 (Utah 1982) (emphasis added) (quoting Restatement (Second) of Torts § 766 (1979)). "The tort of intentional interference with prospective economic relations reaches beyond protection of an interest in an existing contract and protects a party's interest in prospective relationships of economic advantage not yet reduced to a formal contract (and perhaps not expected to be)." *Leigh Furniture*, 657 P.2d at 302 (citing *Buckaloo v. Johnson*, 537 P.2d 865, 868–69 (1975); Restatement (Second) of Torts § 766B cmt. c; Prosser, *Handbook of the Law of Torts* § 130 (4th ed. 1971)). To survive summary judgment on a claim for intentional

interference with economic advantage, a plaintiff must put forth evidence that: "(1) . . . the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 20, 116 P.3d 323, 331 (quoting *Leigh Furniture*, 657 P.2d at 304)*.* However, "[i]t is settled that one party to a contract *cannot* be liable for the tort of interference with contract for inducing a breach by himself or the other contracting party." *Leigh Furniture*, 657 P.2d at 301 (emphasis added) (citations omitted).

Although a claim of intentional interference with economic advantage has three elements, in the instant case, this court need only address the first element—that Trinity Mission intentionally interfered with Ms. Vasquez's existing or potential economic relations—because the lack of evidence on that element proves dispositive. Ms. Vasquez alleges Mr. Pettijohn, Trinity Mission's agent, made a defamatory statement, subjecting Trinity Mission to vicarious liability for these statements and actions. Further, Ms. Vasquez alleges Mr. Pettijohn placed her in a false light by alleging she engaged in an illicit affair. Ms. Vasquez provides no evidence regarding with what existing or potential economic relations Mr. Pettijohn's actions interfered. For this reason alone, Ms. Vasquez's claim cannot survive summary judgment.

This Court recognizes that though the typical injury in a claim for tortious interference with economic advantage involves the driving away of potential or existing customers, the tort allows for other sources of injury. Given the allegations of the Complaint and the evidence included in the motion for summary judgment, the Court can only assume that the existing or potential economic relations purportedly interfered with relate directly to Ms. Vasquez's job with Trinity Mission, in terms of her continued employment. Assuming Ms. Vasquez argues her job qualified as an economic relationship, because it provides a source of income for her, her claim

against Trinity Mission would be that the acts of Mr. Pettijohn interfered with her position of employment. Ms. Vasquez did not bring a claim against Mr. Pettijohn; rather, she complained against her employer, Trinity Mission. Trinity Mission cannot tortiously interfere with its own business. Consequently, Ms. Vasquez has failed to put forth evidence to support the first essential element for this cause of action. For this reason, the Court finds Ms. Vasquez's tortious interference claim fails as a matter of law. The Court GRANTS summary judgment against Ms. Vasquez's tortious interference with economic advantage claim.

### 6. *Intentional Infliction of Emotional Distress*

When faced with a motion for summary judgment on an intentional infliction of emotional distress claim, the plaintiff must put forth evidence from which a jury could decide the defendant

> intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; *and* his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.

*Cabaness v. Thomas*, 2010 UT 23, ¶ 36, 232 P.3d 486, 499 (emphasis in original) (citation omitted). The Court must first decide if a reasonable person would consider defendant's actions "so extreme and outrageous as to permit recovery." *Id.* (citation omitted). If reasonable people could disagree on this point, the Court must let the jury decide whether the actions qualify as sufficiently extreme and outrageous to warrant recovery. *Id.*

"'The liability [for intentional infliction of emotional distress] clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Bennett v. Jones, Waldo, Holbrook & McDonough*, 2003 UT 9, ¶ 64, 70 P.3d 17, 32 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). "To be considered outrageous, the conduct must evoke

outrage or revulsion; it must be more than unreasonable, unkind, or unfair." *Id.* (citations and internal quotation marks omitted). Utah courts have repeatedly rejected claims of intentional infliction of emotional distress arising from alleged wrongful terminations. *Zoumadakis v. Uintah Basin Med. Ctr., Inc.*, 2005 UT App 325, ¶ 8**,** 122 P.3d 891, 894–95. Further, defamation, even if coupled with termination, "does not constitute the kind of outrageous conduct required to support the cause of action." *Id.* (citing *Russell*, 842 P.2d at 905).

Trinity Mission argues Ms. Vasquez's claim fails as a matter of law because she cannot demonstrate Mr. Pettijohn directed his conduct toward her with the intent to inflict emotional distress. Trinity Mission argues it did not engage in any intentional act toward Ms. Vasquez, aside from terminating her employment. Ms. Vasquez argues the Court should consider the totality of the work environment she suffered in as a result of the acts of her supervisor, Mr. Pettijohn. Ms. Vasquez requests the Court determine that the instances and acts she has outlined could allow a jury to determine they rise to level of intentional, outrageous, and intolerable enough to offend generally accepted standards of decency and morality.

Ms. Vasquez has not shown a pattern of intimidation or abuse from which a jury could consider the behavior outrageous and intolerable. The Court has reviewed all evidence provided by Ms. Vasquez and finds the evidence would not evoke emotions of outrage or revulsion at the conduct of Trinity Mission or its agent in a reasonable jury. Ms. Vasquez's supervisor may have subjected her to distasteful, insulting, and threatening behavior, but Ms. Vasquez has not proffered evidence of any intentional, extreme, or outrageous conduct that would fall within the requirements of this cause of action.

Additionally, Ms. Vasquez failed to put forth evidence that Trinity Mission deliberately intended to injure her by comments made by its agent. Ms. Vasquez failed to put forth evidence

that the agent knew or should have known his conduct would result in severe emotional distress to her. And she failed to offer any evidence of severe emotional distress. Ms. Vasquez testified she suffered headaches due to stress but never sought any medical attention. According to information provided to the Court, Ms. Vasquez continued to work, without comment or complaint to other supervisory staff, until after her suspension and suffered no other symptoms. This evidence does not suffice to support a claim for intentional infliction of emotional distress against Trinity Mission.

The Court therefore GRANTS Trinity Mission's motion for summary judgment with respect to Ms. Vasquez's intentional infliction of emotional distress claim.

SO ORDERED.

DATED this 13th day of August, 2013.

BY THE COURT:

EVELYN J. FURSE
United States Magistrate Judge